2005 OK CR 6

**Jimmie Ray SLAUGHTER, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. PCD–2005–77.**

Court of Criminal Appeals of Oklahoma.

March 10, 2005.

Steven M. Presson, Robert W. Jackson, Jackson & Presson, Norman, OK, attorneys for petitioner on appeal.

Seth S. Branham, Assistant Attorney General, Oklahoma City, OK, attorney for the State on appeal.

### OPINION DENYING THIRD APPLICATION FOR POST–CONVICTION AND OTHER RELIEF

LUMPKIN, V.P.J.

¶ 1 Petitioner Jimmie Ray Slaughter was convicted of two counts of First Degree Murder in the District Court of Oklahoma County, Case Number CF–1992–82. He was sentenced to death.[1] Petitioner appealed to this Court in Case No. F–1994–1312. We affirmed his convictions and sentences. *Slaughter v. State,* 1997 OK CR 78, 950 P.2d 839. Rehearing was denied on February 23, 1998. The United States Supreme Court denied certiorari review on October 5, 1998. *Slaughter v. Oklahoma,* 525 U.S. 886, 119 S.Ct. 199, 142 L.Ed.2d 163 (1998).

¶ 2 Petitioner filed his first post-conviction application, but we denied relief. *Slaughter v. State,* 1998 OK CR 63, 969 P.2d 990. The Federal District Court and 10th Circuit Court of Appeals denied habeas relief, and the U.S. Supreme Court denied certiorari. *Slaughter v. Mullin,* — U.S. —, 124 S.Ct. 1681, 158 L.Ed.2d 374 (2004).

¶ 3 In March of 2004, Petitioner filed his second application for post-conviction relief. We denied relief in January of 2005. *Slaughter v. State,* 2005 OK CR 2, 105 P.3d 832.[2] Petitioner then filed this, his third application for post-conviction relief, on January 27, 2005, raising essentially the same issues raised in his second application for post-conviction relief.

---

1. Petitioner was also convicted of five counts of perjury.

2. Petitioner's execution date is currently set for March 15, 2005. A clemency hearing was held on February 15, 2005, and Petitioner was denied relief.

¶ 4 As we have repeatedly stated in our opinions, Oklahoma's Post–Conviction Procedure Act is not designed or intended to provide applicants repeated appeals of issues that have previously been raised on appeal or could have been raised but were not.[3] Our focus is limited to outcome determinative errors and factual innocence claims. *See* 22 O.S.2001, § 1089(C)(2).

¶ 5 Nevertheless, a repeating theme in Petitioner's third post-conviction application concerns the somewhat conspiratorial allegation that this Court has relied on procedural bars and has not conducted "merits review" of the claims Petitioner has raised on appeal.[4] Petitioner steadfastly maintains he has made a "clear and convincing showing of actual innocence." However, we continue to find his statements regarding the strength of those innocence claims to be exaggerated and insufficient to merit post-conviction relief.

¶ 6 Be that as it may, this Court's rules and cases do not impede the raising of factual innocence claims *at any stage* of an appeal. We fully recognize innocence claims are the Post–Conviction Procedure Act's foundation. But in this case we continue to find the evidence presented at trial and on appeal does not support or make a clear and convincing showing of factual innocence.

¶ 7 In proposition one, Petitioner claims "newly discovered" DNA evidence, "new developments" in the field of comparative bullet lead analysis, and "new evidence" of brain fingerprinting demonstrate (1) he is not guilty of murder, (2) no reasonable fact finder could have convicted him of the crimes, and (3) there is now insufficient evidence to support the convictions. We note these claims were previously raised in Petitioner's second post-conviction application.

■ ¶ 8 Regarding brain fingerprinting, we disposed of that claim in our second post-conviction opinion by noting Petitioner never provided the "comprehensive report" regarding the nature of the brain fingerprinting test conducted, the manner in which it was administered, and the results.[5] We thus found the claim was not backed up with sufficient information for us to act upon.

¶ 9 Nothing has changed. The instant post-conviction application omits the same information. Thus, we reject the assertion that brain fingerprinting "evidence" (which he has yet to provide) is entitled to any weight or may have somehow tipped the scales if it had been presented to his jury.[6]

■ ¶ 10 Regarding the "recent DNA testing," we noted in our second post-conviction opinion that Petitioner had failed to timely present supporting documentation regarding that claim, that DNA testing could have been raised as error in prior appeals but was not,[7] and that the so-called "Vicki Mosley" hair was "only one circumstantial, theoretical piece of the puzzle" in a strong evidentiary case of guilt. That being so, we found the post-conviction record lacked sufficient evidence to support a conclusion of factual innocence.

¶ 11 Again, nothing has changed. Petitioner raises the same issue and makes the same arguments regarding the crime scene hair.[8]

---

3. We do not repeat those cases here, as the principles are sufficiently set forth in the opinion rendered just last month in Petitioner's second application for post-conviction relief.

4. This argument loses strength when considering Petitioner's conviction by a jury of his peers and his various appellate claims that have been rejected seven times by four separate courts.

5. We also found the issue could have been previously raised in the direct appeal and insufficient evidence to support a conclusion that brain fingerprinting, based solely upon the MERMER effect, would survive a *Daubert* analysis.

6. Moreover, the significance of the uncorroborated brain fingerprinting results has been over-

stated, as the prosecution also theorized that Petitioner acted with an accomplice.

7. Petitioner now admits this type of testing became available in 1996.

8. Petitioner argues this hair, a single strand found on a sheet at the crime scene, was used extensively to connect him to the murders. He points to the prosecutor's closing arguments speculating Ms. Mosley, Petitioner's then co-worker, was the source of that hair. (The State's theory was that Petitioner or an accomplice planted or left the hair at the scene. A State expert found the crime scene hair and Ms. Mosley's hair to be microscopically similar.) But because hair comparison evidence has been discredited and Ms. Mosley has been excluded as

¶ 12 We acknowledge Miotyping Technologies's lab report indicates Ms. Mosley was excluded as the source of one crime scene hair through mitochondrial DNA testing. But this evidence is far from exculpatory.[9] The trial testimony was that the hair was consistent with Ms. Mosley's hair, not that it was in fact Ms. Mosley's hair. Petitioner's complaint is with the State's arguments and inferences drawn from the evidence, not the evidence itself.

■ ¶ 13 Regarding comparative bullet analysis, our second post-conviction opinion noted the issue was untimely as the research behind this claim was published in July of 2002, nearly two years before Petitioner's instant filing.[10]

¶ 14 Moreover, while it appears comparative bullet lead analysis is coming under fire from some in the scientific community, the bullets fragments here were not identified by that method only. Prior to the lead analysis testimony, the State's firearms experts testified the bullets found at the crime scene were .22 caliber long rifle subsonic bullets with hollow points and no copper wash. One expert testified there were only two brands of that bullet marketed in the U.S. during the relevant time period, the Eley brand from England and RWS made in Germany. Petitioner was in possession of both brands, including the rare Eley brand.[11]

¶ 15 Thus the distinctiveness of these particular bullets is strong evidence of guilt, even if the unobjected-to (and somewhat invited) lead analysis testimony was flawed. This proposition does not warrant post-conviction relief.

■ ¶ 16 In proposition two, Petitioner claims ineffective assistance of his direct appeal counsel resulted in Petitioner's DNA claim being delayed. He claims his counsel should have had the "single hair used to convict" Petitioner DNA tested by mitochondrial procedures during the pendency of his direct appeal.

¶ 17 This claim fails for two reasons. First, we have already found the testing done on the hair, which showed it was not Vicki Mosley's hair, was far from exculpatory. The evidence of guilt remains strong, even without this hair.

¶ 18 Secondly, Petitioner notes he was not considered a candidate for DNA testing because the DNA results alone would not have been exculpatory. Petitioner claims he did not become a viable candidate for the testing until after brain fingerprinting tests were conducted. That being so, his direct appeal counsel cannot be said to have been ineffective for failing to obtain DNA testing, when those efforts would have been fruitless and the results alone would not be exculpatory.

¶ 19 Petitioner has thus failed to show errors by direct appeal counsel that were so serious as to deprive him of effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Furthermore, we find no miscarriage of justice or substantial violation of a constitutional or statutory right. 20 O.S.2001, § 3001.1.

■ ¶ 20 In proposition three, Petitioner raises the familiar claim that Oklahoma's post-conviction statute, 22 O.S.Supp.2004, § 1089, is unconstitutional under the state and federal constitutions because it prohibits "merits review" of "actual innocence" evidence, thereby depriving inmates of due process of law and resulting in cruel and unusual punishment. Then, in proposition four, Petitioner takes issue with Rule 9.7(G)(3), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2004), which requires a Petitioner to file subsequent post-conviction

---

the donor as per DNA testing, Petitioner claims the strength of the evidence has been compromised.

**9.** Petitioner conveniently ignores other strong evidence admitted at trial. *See, e.g. Slaughter*, 1997 OK CR 78, ¶¶ 147–159, 950 P.2d at 876–879. This would include Cecilia Johnson's actions in mailing Negroid hairs to Petitioner for purpose of planting at the crime scene.

**10.** Rule 9.7(B), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2004).

**11.** Eley's bullets comprised .0125–.0116% of the ammunition sold in the U.S. in 1990–91. The RWS bullets were excluded as the bullets found at the crime scene.

applications "within sixty (60) days from the date the previously unavailable legal or factual basis serving as the basis for a new issue is announced or discovered." Petitioner claims this rule is unconstitutional because, again, it bars review of his actual innocence claims.

¶ 21 However, we reject both propositions, as we find no actual innocence claims in Petitioner's post-conviction filings that have been barred from review. Given the prosecution's accomplice and alternative theories, along with the strong evidence of guilt admitted at trial, it is a gross overstatement to claim that the DNA results from one crime scene hair, the conceivable flaws in comparative bullet lead analysis, and uncorroborated and likely inadmissible brain fingerprinting tests rise to the level of actual innocence claims.[12]

### DECISION

¶ 22 After carefully reviewing Petitioner's third application for post-conviction relief, motion for evidentiary hearing, motion for discovery, and motion for stay of execution, we find relief is not warranted, and therefore said application and motions are **HEREBY DENIED.**

CHAPEL, P.J., and JOHNSON, J.,: concur.

---

12. Moreover, we find the sixty days provided in Rule 9.7(G) to be a reasonable time period. The rule addresses post-conviction applicants filing *subsequent* applications. It is wholly reasonable to require these subsequent applicants to notify the Court of "previously unavailable legal or factual" grounds "serving as the basis for a new

issue" within sixty days that they are announced or discovered. Once a timely application is filed, an extension of time to further develop the application with added materials pertaining to the timely raised issue can be submitted to the Court. The Court will then determine the merits of the need for additional time on a case-by-case basis.