FILED
United States Court of Appeals
Tenth Circuit

June 14, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

JOHNNY DALE BLACK,

　　　　　Petitioner - Appellant,

　　v.

RANDALL G. WORKMAN,
Oklahoma State Penitentiary,

　　　　　Respondent - Appellee.

No. 10-6062
(D.C. No. 5:02-CV-00225-C)
(W. D. Okla.)

## ORDER

Randy A. Bauman, Assistant Federal Public Defender, (Sarah M. Jernigan, Assistant Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Western District of Oklahoma, Oklahoma City, Oklahoma, for Petitioner - Appellant.

Seth S. Branham, Assistant Attorney General, Office of the Attorney General for the State of Oklahoma, Oklahoma City, Oklahoma, for Respondent - Appellee.

Before **LUCERO**, **HARTZ**, and **O'BRIEN**, Circuit Judges.

**HARTZ**, Circuit Judge.

　　Defendant Johnny Black was convicted of first-degree murder and battery

with a dangerous weapon because of his role in an assault that left Bill Pogue

dead and Rick Lewis suffering from 13 stab wounds. On the recommendation of the jury, Defendant received a death sentence on the first-degree murder conviction.

After unsuccessfully appealing to the Oklahoma Court of Criminal Appeals (OCCA) and pursuing two postconviction proceedings in state court, Defendant unsuccessfully applied for relief under 28 U.S.C. § 2254 in the United States District Court for the Western District of Oklahoma. He appeals the district court's decision, raising 14 claims: (1) the trial court improperly dismissed at voir dire two jurors who had reservations about the death penalty; (2) the prosecutor struck an African-American man from the jury pool on account of race; (3) the trial court did not properly instruct the jury on the relationship between first-degree murder and manslaughter; (4) trial counsel was ineffective during closing argument for undercutting the defense that Defendant was guilty only of manslaughter; (5) trial counsel was ineffective for failing to investigate and present evidence on Mr. Pogue's health and ability to avoid a confrontation with Defendant and his companions; (6) a juror improperly told the other jurors about his personal knowledge of the crime scene; (7) the prosecutors made comments during guilt- and sentencing-stage closing arguments that improperly invoked sympathy for the victim, improperly stated the prosecutors' motives and religious faith, diminished the jury's sense of responsibility, and undermined Defendant's right to an individualized sentence; (8) the cumulative effect of all

errors rendered his trial unfair; (9) trial counsel was ineffective for failing to investigate and present evidence of Defendant's brain damage; (10) trial counsel was ineffective for failing to pursue Defendant's "defense of brother" theory; (11) trial counsel was ineffective for failing to object to the introduction of victim-sympathy evidence; (12) the trial court improperly excluded the testimony of Defendant's brother during the penalty phase of trial; (13) the trial court failed to give a "defense of brother" instruction; and (14) appellate counsel was ineffective for failing to raise on direct appeal Defendant's claims 9, 10, 11, 12, and 13. On claims one through eight we affirm on the merits, generally because the OCCA did not unreasonably apply federal law in rejecting these claims. On the remaining claims the district court denied relief on the ground of procedural bar. Before we can determine whether we agree with the district court, we need to resolve a question of Oklahoma procedural law—whether Oklahoma's bar of Defendant's second postconviction application was independent of federal law or instead required the OCCA to examine the merits of Defendant's federal constitutional claims. We are therefore certifying a question of state law to the OCCA and abating this appeal pending consideration by the OCCA of our certification request.

I.    BACKGROUND

A.    Factual Background

-3-

On the evening of January 4, 1998, Defendant was at the home of his brother Jesse Black watching a professional football game with Jesse, brother Jimmy Black, Robert Seale, and several others. A nervous Cal Shankles came by to ask for assistance in finding his brother. He added that he needed protection because Justin Hightower was after him for having an affair with Mr. Hightower's soon-to-be ex-wife. Mr. Shankles, the Black brothers, and Mr. Seale left the home in a green Neon. Defendant drove while the others watched for Mr. Hightower's vehicle, allegedly a black Blazer. The OCCA's opinion continues the account of the tragic attack on two men who happened to be driving a black Blazer in the wrong place at the wrong time:

> [While Defendant and his companions were looking for Hightower,] Bill Pogue and his son-in-law, Rick Lewis, drove to Ringling in Pogue's black Blazer to buy some chewing tobacco at a local convenience store. On their way back to Pogue's home, they passed the Neon at an intersection and one of [the Neon's] passengers yelled something at Pogue's Blazer. The Neon turned around and pulled in behind Pogue traveling at a high rate of speed and flashing its lights. Shortly thereafter, the Neon passed Pogue's Blazer and stopped in front of it. It was disputed at trial whether the Neon blocked the roadway.
>
> According to Rick Lewis, . . . he and Pogue exited the Blazer. Lewis went around the back of the Blazer and came up behind Pogue. The four doors of the Neon opened and Jimmy Black, who was seated in the rear on the driver's side, got out and ran barreling towards [Lewis and Pogue]. In response, Pogue hit Jimmy Black in the face and the two began to wrestle towards and into the east bar ditch. Jesse Black and [Defendant] then ran towards Lewis, who hit Jesse Black, momentarily knocking Jesse down. Lewis was able to sidestep [Defendant] and throw him into the front of the Blazer. [Defendant] and Jesse Black then began fighting with Lewis in the

-4-

west bar ditch. During the fight, Lewis looked up to see Cal Shankles with some type of club and felt a couple of blows to the head. Lewis did not remember seeing Shankles during the entirety of the fight and the evidence showed Shankles went from bar ditch to bar ditch alternately hitting Lewis and Pogue with some type of club. Lewis remembered seeing Robert Seale standing at the back of the Neon holding what looked like a tree branch, but never saw him fighting with anyone.

After several minutes of fighting, Lewis was able to break free and make his way to the east bar ditch where he saw Pogue on top of Jimmy Black and [Defendant] over Pogue's back. Lewis pushed [Defendant] off of Pogue and helped Pogue stand up and head toward the Blazer. Jesse Black then hit Lewis in the side of the head and said "that's for bustin' my lip." The Black brothers, Seale and Shankles then lined up behind the Neon yelling obscenities and taunting Lewis and Pogue. While Lewis assisted Pogue, who had been stabbed eleven times, into the Blazer, the Neon sped away. Although Lewis did not realize it during the fight, [Defendant] had stabbed him thirteen times with wounds to the back of Lewis' head, spine, chest, side, buttock, leg and arm. After loading Pogue into the Blazer, Lewis raced him back to the Pogue barn, where family members took over and rushed both men to the Healdton hospital. Lewis was treated for his injuries and was later transferred to Ardmore for care. Pogue died at the Healdton hospital.

The morning after the fight [Defendant] fled to Texas, where he was later apprehended and voluntarily confessed. Jesse and Jimmy Black, Robert Seale and Cal Shankles were also arrested and made voluntary statements. In [Defendant's] voluntary statement to police, he claimed he did not go with Shankles to fight, but to see "what the deal was." He claimed he never intended to kill Pogue and he did not understand why Lewis and Pogue attacked his brothers. He maintained he did not remember stabbing Lewis and that he simply reacted because he was afraid for his brothers, Jesse and Jimmy. He claimed when he went to Jimmy's aid, he told Pogue to get off his brother or he would "stab" or "cut" him. When Pogue did not move, he stabbed him. According to [Defendant], he and Pogue began to wrestle and roll around and Pogue kept rolling onto the knife. He maintained there was no intent to kill anyone and that his brothers did not know he used his knife.

-5-

*Black v. State*, 21 P.3d 1047, 1055–56 (Okla. Crim. App. 2001) (footnote omitted).

**B.      Judicial Proceedings**

On January 26, 1999, after three days of testimony, the jury convicted Defendant of first-degree murder and assault and battery with a dangerous weapon.  The penalty-stage proceeding began the next day, and the jury returned a recommendation of the death sentence after an additional day of testimony.  We will defer any description of events during the trial until discussion of the specific issues raised on appeal.

Defendant appealed to the OCCA, which affirmed his convictions and sentence.  *See Black*, 21 P.3d 1047.  The United States Supreme Court denied his petition for a writ of certiorari.  *See Black v. Oklahoma*, 534 U.S. 1004 (2001).  On October 18, 2000, while his direct appeal was pending, Defendant filed an application for postconviction relief in the OCCA.  On May 23, 2001, the OCCA denied relief.

On October 22, 2002, Defendant filed his application under 28 U.S.C. § 2254. He raised the issues being pursued on this appeal and several others.[1] He also moved for discovery and for an evidentiary hearing.

In its response brief the State asserted that several of Defendant's claims should be rejected because they had not been exhausted in state court. Defendant did not contest that these claims were unexhausted but argued that the district court should excuse exhaustion or, in the alternative, should hold the case in abeyance while Defendant presented these claims to the OCCA. Although the record does not show whether the district court ruled on Defendant's requests, Defendant filed his second state application for postconviction relief in the OCCA on October 2, 2006. The application raised the unexhausted claims and two others not raised in this court.[2] The OCCA denied relief on April 14, 2008, holding that all the claims were procedurally barred because they should have been raised earlier.

---

[1] Defendant raised the following issues not presented on this appeal: (1) the trial court's manslaughter instruction incorrectly defined adequate provocation; (2) there was insufficient evidence to support his first-degree-murder conviction; (3) one of the jurors did not reveal that he knew and did business with Mr. Pogue; (4) Oklahoma's "heinous, atrocious, and cruel" aggravating circumstance is unconstitutional; (5) Oklahoma's "continuing threat" aggravating circumstance does not narrow the class of persons eligible for death; and (6) Oklahoma's sentencing scheme does not require proof beyond a reasonable doubt that aggravation outweighs mitigation.

[2] The other claims were (1) that one of Defendant's jurors failed to reveal that he knew Mr. Pogue and (2) that Defendant's postconviction counsel was ineffective.

On February 10, 2010, the federal district court denied Defendant's § 2254 application, his motion for discovery, and his motion for an evidentiary hearing. It rejected claims nine through fourteen as procedurally defaulted and denied on the merits the remaining claims raised here. Defendant has been granted a certificate of appealability (COA), *see* 28 U.S.C. § 2253(c)(1) (requiring COA to pursue appeal of issue in circuit court), by either the district court or this court on all issues raised on appeal and has not sought from this panel a COA on any other issues.

## II.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act (AEDPA) a federal court in a § 2254 proceeding must be exquisitely deferential to the state court's resolution of the defendant's claims. As the Supreme Court said in *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011), AEDPA established "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (citation and internal quotation marks omitted). When a claim has been adjudicated on the merits in state court, a federal court can grant habeas relief on the claim only if the state-court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

§ 2254(d)(1), (2).  Under AEDPA, "clearly established law as determined by [the Supreme] Court refers to the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision."  *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004) (internal quotation marks omitted).  As for fact-finding, a federal court must accept facts found by the state court unless the defendant rebuts the finding "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

A state-court decision is "contrary to" Supreme Court law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," *Williams v. Taylor*, 529 U.S. 362, 405 (2000), or "if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts," *id.* at 413.  It is not necessary that the state-court decision cite applicable Supreme Court decisions.  "[I]ndeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  In "making the 'unreasonable application' inquiry," we "ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Williams*, 529 U.S. at 409.  "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Renico v. Lett*, 130 S. Ct. 1855, 1862 (2010) (internal quotation marks omitted).  "Indeed, a federal habeas court may not issue the writ simply because

that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* (internal quotation marks omitted). To evaluate whether a state court unreasonably applied a Supreme Court rule, we must consider the specificity of the rule. *See Yarborough*, 541 U.S. at 664. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* When the state court does not explain its reasoning, the applicant must still show that "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011); *see Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) (Under AEDPA, "we owe deference to the state court's *result*, even if its reasoning is not expressly stated.").

The Supreme Court has recently emphasized in the strongest terms the obstacles to § 2254 relief. In *Harrington* it observed that § 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." 131 S. Ct. at 786 (internal quotation marks omitted). Consequently, to obtain relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87. Also, although federal-court deference to the state court's decision is appropriate only on claims "adjudicated

-10-

on the merits" by the state court, 28 U.S.C. § 2254(d), the defendant has the burden of showing that the claim was not so adjudicated. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington*, 131 S. Ct. at 784–85.

## III. VOIR DIRE

"[A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty . . . ." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). Defendant argues that the trial court made it impossible for anyone with reservations about the death penalty to serve on his jury because prospective juror Williams was dismissed for answering No and prospective juror Skiles was dismissed for answering Yes to the same question regarding their willingness to consider the death penalty. Defendant also argues that the trial court erred in its dismissals of Williams and Skiles and that the trial court's "failure to allow further explanation through *voir dire* was improper." Aplt. Br. at 99. The OCCA's contrary decision was not, however, an unreasonable application of clearly established Supreme Court law, nor did the OCCA make an unreasonable determination of the facts.

The trial court informed the jury that the case involved a charge of first-degree murder and that the three possible punishments for the offense were death, imprisonment for life without parole, or imprisonment for life. It then asked the jurors whether they could consider all three options. Williams and Skiles both expressed reservations about the death penalty. The court questioned each separately. It asked Williams:

> [I]f you found . . . that beyond a reasonable doubt the Defendant was guilty of Murder in the First Degree, and if under the evidence, the law and the circumstances of the case the law would permit you to consider a sentence of death, are your reservations about the death penalty such that regardless of the law, the facts and the circumstances, you would not consider inflicting a death penalty?

Tr., Vol. I at 67. Williams responded "No sir" and was excused by the court. *Id.* at 68. When Skiles was later asked essentially the same question, she responded "Yes sir" and was also excused. *Id.* at 71.

Defendant asserts that if both Yes and No answers to the court's question disqualified a juror, then every juror who expressed reservations about the death penalty would be excluded, contrary to *Witherspoon*. He argues that at the least the court should have asked, or permitted counsel to ask, further questions to clarify the ambiguity.

If courts were required to voir dire jurors by e-mail, Defendant's argument might be compelling. But his argument ignores the role of body language, tone of voice, and other nonverbal signals in communication. The concerned parties

-12-

apparently understood both answers by the jurors as stating an unequivocal inability to render a verdict of death. Defense counsel did not argue at trial that either juror's response had been ambiguous.[3] This is not remarkable because Yes and No often mean the same thing in response to a question phrased in the negative, even though language purists may find this practice unacceptable. The OCCA said that "[a]lthough a literal reading of Williams' answer indicated that she may be able to consider the death penalty, the parties understood otherwise." *Black*, 21 P.3d at 1061. We accept this fact finding because Defendant has not pointed to clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1) (granting presumption of correctness to state-court fact finding). The OCCA therefore held that the trial court did not err in removing the two jurors without further questioning. (Defense counsel had asked for an opportunity to rehabilitate Williams, but not Skiles.) This holding was not an unreasonable interpretation of Supreme Court law. Indeed, Defendant cites no authority for the proposition that he had the right to question further a juror who said that she could not vote for the death penalty. We deny relief on this claim.

## IV. *BATSON* CLAIM

The Constitution forbids a prosecutor from exercising a peremptory challenge to a prospective juror on account of the juror's race. *See Batson v.*

---

[3] To the contrary, when the trial judge said, "I asked [Williams] if she would consider [the death penalty,] and she said no," the response of defense counsel was, "And I agree." Tr., Vol. 1 at 69.

*Kentucky*, 476 U.S. 79, 89 (1986). When defense counsel believes that the prosecutor has violated *Batson*, a three-step review process is in order. "[O]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." *Purkett v. Elem*, 514 U.S. 765, 767 (1995) (per curiam). "At [the] second step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 768 (brackets and internal quotation marks omitted). But if, at step three, the court finds the proffered ground to be pretextual, it may determine that the strike was purposeful discrimination. *See id.*

Defendant claims that the prosecution violated *Batson* when it struck one of only two African-Americans among the 400 to 500 members of the jury venire. Defense counsel raised at trial a *Batson* objection to the strike. When the trial court asked the prosecutor why he had struck the prospective juror, he responded that the man had failed to disclose that he had been charged with first-degree burglary when the panel members were asked whether they had been accused of a crime. The trial court ruled the explanation reasonable and rejected the *Batson* objection. Defendant presented no evidence to rebut the prosecutor's explanation.

-14-

On direct appeal the OCCA upheld the trial court's ruling because it was supported by the record and was not clearly erroneous. *See Black*, 21 P.3d at 1061–62. The court noted that the prosecutor had also removed a white juror who had "belatedly disclosed his prior misdemeanor criminal record." *Id.*

As Defendant apparently agrees, the prosecutor's explanation satisfied step two of the *Batson* three-step process. Defendant argues, however, that evidence not available to him at trial but obtained for his direct appeal to the OCCA shows that the prosecutor's explanation was pretextual. According to Defendant, when his appellate counsel ran background checks on the seated jurors, he discovered that a white man who served on the jury had been convicted of a misdemeanor that he had not disclosed during voir dire, thereby showing disparate treatment of whites and African-Americans. On direct appeal Defendant presented the criminal-background check on that juror to the OCCA in an application for an evidentiary hearing to supplement the record on appeal. *See id.* at 1062 n.10. But the court, after summarizing the document, denied the request. The OCCA wrote:

> *Batson* is not violated whenever prospective jurors of different races provide similar responses and one is excused while the other is not. *Batson* requires a race neutral explanation which was provided in this case. The prosecutor excused both a black and a white juror with criminal records. We do not find an evidentiary hearing is warranted based on the application presented. As such, the request is denied.

*Id.* (citation and internal quotation marks omitted). Defendant now asks us to consider the criminal-history report and adjudicate his *Batson* claim de novo.

-15-

First we address our standard of review. Defendant's request for de novo review of his *Batson* claim relies on this court's decision in *Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000). In that case we held that the defendant was entitled to an evidentiary hearing on his ineffective-assistance-of-counsel claim because he acted diligently in state court to develop the factual basis of his claim but had been denied a hearing in state court. *See id.* at 1287–88 n.2. And because the defendant had not received a "full, fair, and adequate hearing" in state court, we reviewed the evidence de novo, without deference to the state court, in deciding that we should remand to the district court for an evidentiary hearing. *Id.* at 1289. Relying on *Mayes*, Defendant contends that we should consider the criminal-background check on the seated juror without deferring to the Oklahoma courts and remand this issue to the district court for an evidentiary hearing.

We disagree. To begin with, much of our decision in *Mayes* is of questionable authority in light of later Supreme Court case law. Last year the Supreme Court decided in *Cullen v. Pinholster*, 131 S. Ct. 1388, 1400–01 (2011), that even if a federal-court evidentiary hearing is not barred by § 2254(e)(2), the evidence so obtained is inadmissible in reviewing a claim adjudicated on the merits in state court. It held that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," *id.* at 1398, and indicated that the same is true, *a fortiori*, to review under § 2254(d)(2), which explicitly states that the state-court decision must have been

unreasonable "'in light of the evidence presented in the State court proceeding,'" *id.* at 1400 n.7; *see Blue v. Thaler*, 665 F.3d 647, 656 & n.27 (5th Cir. 2011). Such review, of course, is deferential, not de novo. *See Cullen*, 131 S. Ct. 1388 at 1401–02; *cf. id.* at 1419 (Sotomayor, J. dissenting) (stating that review should be deferential even if additional evidence is produced in federal evidentiary hearing).

Dissenting Justice Sotomayor "assume[d] that the majority d[id] not intend to suggest that review is limited to the state-court record when a petitioner's inability to develop the facts supporting his claim was the fault of the state court itself." *Id.* at 1417 n.5 (Sotomayor, J., dissenting). But this assumption would not help Defendant, because he has no acceptable excuse for not developing the facts in state court. Defendant argues that he should have been granted access during voir dire to the State's information on the criminal records of the prospective jurors. But he has not shown that the trial court had a legal obligation to order such disclosures by the prosecutor to Defendant. Defendant was able to obtain the criminal records of jurors through a state freedom-of-information-act request during his direct appeal to the OCCA. He does not explain why such records could not have been obtained by the time of voir dire. Indeed, he admits in his opening brief that the prosecutor informed defense counsel months before trial that the information was of public record. Defendant does not even attempt to argue that the prosecution has a general obligation to

-17-

provide to a defendant evidence that is reasonably obtainable by other means. Defense counsel may have had good reason not to bother seeking the criminal-background records. The criminal histories of prospective jurors may not have been important in exercising defense peremptory challenges, counsel may have presumed that jurors would be truthful about their criminal records, or counsel may not have anticipated that the prosecutor would use the criminal records to rationalize a peremptory strike actually made on racial grounds (particularly when Defendant apparently was not himself a member of a minority racial group). We note that there has been no claim of ineffective assistance of counsel in not obtaining the records in time for trial. The reasonableness of the decision not to obtain the records for voir dire does not, however, free the defense from the consequences of the decision. There is no good substitute for a full airing of a *Batson* issue at the time of voir dire, when memories are fresh and the trial judge can best assess the veracity of the prosecutor by viewing nonverbal cues. Indeed, for essentially this reason, this court refused in a pre-AEDPA case to consider on habeas a pretext argument not raised in the state trial court even though the record "offer[ed] troubling evidence of the pretextual character of the prosecutor's ostensibly neutral reasons." *Johnson v. Gibson*, 169 F.3d 1239, 1248 (10th Cir. 1999).

Turning to the merits of Defendant's *Batson* claim, we can grant Defendant relief only if the state court's rejection of his pretext claim was "'an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding.' 28 U.S.C. § 2254(d)(2)." *Rice v. Collins*, 546 U.S. 333, 338 (2006). We must determine whether "it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Id.* "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' § 2254(e)(1)." *Id.* at 338–39.

Defendant wisely does not challenge the rejection of his *Batson* claim based on the trial record. The trial judge had no ground for finding pretext. What Defendant does argue is that the OCCA's decision on the *Batson* issue was unreasonable in light of the evidence presented to it that the prosecutor had failed to strike from the jury a white man who had not disclosed a prior misdemeanor conviction during voir dire.

One could debate whether the evidence of the white juror's conviction is part of the record that *Cullen* permits us to consider. The OCCA decided Defendant's direct appeal without reference to the conviction. It refused to permit an evidentiary hearing at which the background check of the juror could be made part of the record on appeal. Therefore, it appears that evidence of the conviction was not part of the record. On the other hand, evidence of that conviction was presented to the OCCA during the direct appeal and considered by that court in denying a hearing. *See Black*, 21 P.3d at 1062 n.10. Perhaps that makes the evidence part of the "record" for purposes of § 2254(d)(2). We need

-19-

not resolve the issue, however, because the evidence of the conviction does not suffice to afford Defendant relief.

The question before us is whether the prosecution's failure to strike a white juror despite his not disclosing a prior misdemeanor conviction would establish by clear and convincing evidence that the prosecutor's challenge to the prospective African-American juror was racially motivated.  The answer is No.  To be sure, the evidence concerning the selected white juror raises suspicion.  Whenever the prosecutor's explanation for striking a minority juror would also apply to a white juror who was not struck, the explanation loses some credibility.  But a prospective white juror with a "belatedly disclosed" prior misdemeanor conviction had been struck, suggesting that the explanation for striking the African-American prospective juror had also been applied to a white man.  As the OCCA wrote, "*Batson* is not violated 'whenever prospective jurors of different races provide similar responses and one is excused while the other is not.'" *Id.* at 1062 n.10 (quoting *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994)).  The significance of a failure to disclose a prior conviction may depend on the nature of the offense and how long ago it had occurred.  And other (nonracial) characteristics of the prospective juror may outweigh the failure.  Here, the misdemeanor conviction of the white juror had been for impaired driving (a charge reduced from driving while intoxicated) 17 years before Defendant's trial,

and the penalty had been only a $100 fine; but the African-American's arrest had been about two years before Defendant's trial.

The limited evidence of the prosecution's racial motivation here is far less than what is required to overturn a state trial court's *Batson* ruling on habeas review. Even on direct review, without the deference required by AEDPA, the Supreme Court stated that a reviewing court must defer to the state trial judge's finding of no racial motivation "in the absence of exceptional circumstances." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (internal quotation marks omitted). The only Supreme Court decision to set aside on habeas review a state-court rejection of a *Batson* claim provides a helpful illustration of what is sufficient for a federal habeas court to determine that a state court's factual findings were unreasonable. We quote in a footnote the Supreme Court's summary in *Miller-El v. Dretke*, 545 U.S. 231 (2005), of the evidence of racial motivation that caused it to hold that, contrary to a state-court finding, the prosecution had violated *Batson*.[4]

---

[4] The Supreme Court wrote:

> In the course of drawing a jury to try a black defendant, 10 of the 11 qualified black venire panel members were peremptorily struck. At least two of them, Fields and Warren, were ostensibly acceptable to prosecutors seeking a death verdict, and Fields was ideal. The prosecutors' chosen race-neutral reasons for the strikes do not hold up and are so far at odds with the evidence that pretext is the fair conclusion, indicating the very discrimination the explanations were meant to deny.

(continued...)

-21-

Further development of the evidence might demonstrate racial bias in this

case, but too much time has passed since the jury selection in Defendant's trial

---

[4](...continued)

      The strikes that drew these incredible explanations occurred in a selection process replete with evidence that the prosecutors were selecting and rejecting potential jurors because of race. At least two of the jury shuffles conducted by the State make no sense except as efforts to delay consideration of black jury panelists to the end of the week, when they might not even be reached. The State has in fact never offered any other explanation. Nor has the State denied that disparate lines of questioning were pursued: 53% of black panelists but only 3% of nonblacks were questioned with a graphic script meant to induce qualms about applying the death penalty (and thus explain a strike), and 100% of blacks but only 27% of nonblacks were subjected to a trick question about the minimum acceptable penalty for murder, meant to induce a disqualifying answer. The State's attempts to explain the prosecutors' questioning of particular witnesses on nonracial grounds fit the evidence less well than the racially discriminatory hypothesis.

      If anything more is needed for an undeniable explanation of what was going on, history supplies it. The prosecutors took their cues from a 20-year-old manual of tips on jury selection, as shown by their notes of the race of each potential juror. By the time a jury was chosen, the State had peremptorily challenged 12% of qualified nonblack panel members, but eliminated 91% of the black ones.

      It blinks reality to deny that the State struck Fields and Warren, included in that 91%, because they were black. The strikes correlate with no fact as well as they correlate with race, and they occurred during a selection infected by shuffling and disparate questioning that race explains better than any race-neutral reason advanced by the State. The State's pretextual positions confirm Miller–El's claim, and the prosecutors' own notes proclaim that the Sparling Manual's emphasis on race was on their minds when they considered every potential juror.

*Miller-El v. Dretke*, 545 U.S. 231, 265–66 (2005).

for that to be a reliable exercise.  *See Johnson*, 169 F.3d at 1248 (refusing to reverse state court's *Batson* fact finding on ground of evidence of pretext not raised in state proceedings); *cf. Snyder*, 552 U.S. at 486 (refusing to remand to give state another opportunity to explain its strikes).  In any event, we must decide the issue on the evidence presented to the state court (which we have assumed includes the white juror's criminal-background check).  And we cannot say that evidence that a white juror failed to disclose a 17-year-old misdemeanor conviction punished by a $100 fine shows clearly and convincingly that the trial judge erred in believing the prosecutor's explanation for striking a prospective African-American juror.

For the above reasons, we hold that Defendant has failed to establish a *Batson* violation.

## V.  INSTRUCTIONS ON FIRST-DEGREE MURDER AND MANSLAUGHTER

That Defendant stabbed and killed Mr. Pogue was not disputed at trial. What was in dispute was whether Defendant stabbed Mr. Pogue with the intent necessary to support a first-degree-murder conviction.  Defendant's counsel argued that Defendant killed in the heat of passion and should be convicted of manslaughter.  The trial court instructed the jury on manslaughter, but the jury ultimately accepted the prosecution's first-degree-murder theory.

Defendant contends that the court's guilt-stage jury instructions unconstitutionally "impair[ed] the jurors' full consideration of [his manslaughter] theory" because they "did not require the prosecution to disprove the existence of heat of passion, nor did they allow consideration of manslaughter until and unless jurors rejected the first degree murder charge." Aplt. Br. at 114. He relies on *United States v. Lofton*, 776 F.2d 918, 920 (10th Cir. 1985), which, in a direct appeal from a federal criminal conviction, held that when a defendant properly raises a heat-of-passion defense, the trial court must instruct the jury (1) that manslaughter is the defendant's theory of defense and (2) that the government has the "duty to prove beyond a reasonable doubt the absence of heat of passion in order to obtain a murder conviction."

The jury instructions on murder and manslaughter included a straightforward tour of the elements of murder and manslaughter. Instruction No. 6 set forth the elements of first-degree murder:

> [N]o person may be convicted of murder in the first degree unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:
>
> First, the death of a human;
> Second, the death was unlawful;
> Third, the death was caused by the defendant;
> Fourth, the death was caused with malice aforethought.

Trial R., Vol. III at 78. Instruction No. 7 informed the jury that "'[m]alice aforethought' means a deliberate intention to take away the life of a human

being," an intention that must have been formed before the homicidal act and existed at the time of the act. *Id.* at 79. It also told the jury: "The external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent existed in the mind of the defendant to take a human life. External circumstances include words, conduct, demeanor, motive, and all other circumstances connected with a homicidal act." *Id.*[5]

Instruction No. 8 stated the elements of first-degree manslaughter:

> The defendant is charged with murder in the first degree-Count I. You are instructed that, in addition to evidence concerning the crime of murder in the first degree, evidence has also been introduced concerning the lesser crime of manslaughter in the first degree.

---

[5] The full Instruction No. 7 stated:

> "Malice aforethought" means a deliberate intention to take away the life of a human being. As used in these instructions, "malice aforethought" does not mean hatred, spite or ill-will. The deliberate intent to take a human life must be formed before the act and must exist at the time a homicidal act is committed. No particular length of time is required for formation of this deliberate intent. The intent may have been formed instantly before commission of the act.

> The external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent existed in the mind of the defendant to take a human life. External circumstances include words, conduct, demeanor, motive, and all other circumstances connected with a homicidal act.

Trial R., Vol. III at 79.

No person may be convicted of manslaughter in the first degree by dangerous weapon unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

First, the death of a human;
Second, the death was not excusable or justifiable;
Third, inflicted by means of a dangerous weapon;
Fourth, caused by the defendant;
Fifth, when performing the conduct which caused the death, defendant was in a heat of passion.

*Id.* at 80. And Instruction No. 9 addressed the meaning of *heat of passion*:

Heat of passion exists when four requirements are proven. These requirements are:

First, adequate provocation;
Second, a passion or an emotion such as fear, terror, anger, rage, or resentment existed in defendant;
Third, the homicide occurred while the passion still existed, and before there was reasonable opportunity for the passion to cool;
Fourth, there was a causal connection between the provocation, the passion and the homicide.

*Id.* at 81.

Instruction No. 10 explained that "'[a]dequate provocation' refers to any improper conduct of the deceased toward the defendant which naturally or reasonably would have the effect of arousing a sudden heat of passion within a reasonable person in the position of the defendant," and generally includes "actions which are calculated to provoke an emotional response and ordinarily cause serious violence," such as "[p]ersonal violence or ag[g]ression by the

deceased of a nature sufficiently violent to cause or threaten to cause pain, bloodshed, or bodily harm to the defendant." *Id.* at 82.[6]

Finally, Instruction No. 11 defined the passion or emotion necessary for heat of passion as "any strong emotion, such as fear, terror, anger, rage or resentment. This passion or emotion must have existed to such a degree as would naturally affect the ability to reason and render the mind incapable of cool

_____

[6] The full Instruction No. 10 stated:

"Adequate provocation" refers to any improper conduct of the deceased toward the defendant which naturally or reasonably would have the effect of arousing a sudden heat of passion within a reasonable person in the position of the defendant. Generally, actions which are calculated to provoke an emotional response and ordinarily cause serious violence are recognized as adequate provocation. Actions that do not ordinarily provoke serious violence do not constitute adequate provocation. In determining whether the deceased's conduct was adequate provocation, the conduct is judged as a person or [sic] reasonable intelligence and disposition would respond to it. Mere words alone, or threats, menaces, or gestures alone, however offensive or insulting, do not constitute adequate provocation. However, words, threats, menaces, or gestures, when considered in connection with provoking conduct of the deceased, may constitute adequate provocation. Personal violence or agression [sic] by the deceased of a nature sufficiently violent to cause or threaten to cause pain, bloodshed, or bodily harm to the defendant may be adequate provocation.

Trial R., Vol. III at 82.

reflection," but there must not have been "time for the emotion to cool or subside" before the homicide. *Id.* at 83.[7]

---

[7] The full Instruction No. 11 stated:

The passion or emotion which must exist in the defendant refers to any strong emotion, such as fear, terror, anger, rage or resentment. This passion or emotion must have existed to such a degree as would naturally affect the ability to reason and render the mind incapable of cool reflection. However, the passion need not have been such as would entirely overcome reason, or be so overpowering as to destroy free exercise of choice. This emotional state must, however, actually dominate the person at the time of the commission of the homicidal act and must be directed toward the deceased and not toward another.

There must not be a reasonable opportunity for the passion to cool. This means that the homicide must have occurred while the defendant was still affected by the passion or emotion. The homicide must have followed the provocation before there was time for the emotion to cool or subside. Whether or not there was a reasonable opportunity for the passion to cool depends upon whether, under all the circumstances of the particular case, there was such a lapse of time between the provocation and the homicidal act that the mind of a reasonable person would have cooled sufficiently, so that the homicide was directed by reason, rather than by passion or emotion.

The length of time that constitutes a reasonable opportunity for the passion to cool may vary according to the circumstances of the particular case.

"Causal connection" means that the provocation by the deceased must have caused the passion or emotion of the defendant and that passion or emotion must have caused the act which resulted in death.

Trial R., Vol. III at 83–84.

Defendant's challenge to these instructions is based on two complaints. First, Instruction No. 6, which set forth the elements of first-degree murder, did not affirmatively say that the state must disprove that Defendant acted in the heat of passion. Second, Instruction No. 8 suggested that the jury should not consider manslaughter unless it found the proof of first-degree murder to be wanting, saying: "If you have a reasonable doubt of the defendant's guilt of the charge of murder in the first degree, you must then consider the charge of manslaughter in the first degree." *Id.* at 80.

Defendant did not raise this challenge at trial. But he invoked *Lofton* on his direct appeal. The OCCA, which reviewed the unpreserved issue only for plain error, rejected the argument, distinguishing *Lofton*. *See Black*, 21 P.3d at 1064–67. We need not, however, evaluate the OCCA's *Lofton* analysis. Even if we were to disagree with that court's reasoning, our disagreement would be irrelevant. It is not ground for § 2254 relief that a state court did not follow a circuit-court ruling on constitutional law. The only ground for setting aside the OCCA's decision would be if that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*." 28 U.S.C. §2254(d)(1) (emphasis added).

When we limit the case law under consideration to Supreme Court precedent, we conclude that Defendant has failed to establish that the OCCA's reasoning or decision on the *Lofton* issue merits relief under § 2254(d)(1). *Lofton*

-29-

relied on *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975), which unanimously overturned a Maine murder conviction because the jury instructions did not "require[] the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation." The quoted language would appear to support Defendant's challenge to the instructions at his trial, because they did not explicitly require the state to disprove heat of passion as part of its first-degree-murder case. But, as the author of *Mullaney* emphatically argued in his dissent two years afterwards in *Patterson v. New York*, 432 U.S. 197 (1977), the later opinion significantly limited *Mullaney*. *See Patterson*, 432 U.S. at 216–32 (Powell, J., dissenting). According to *Patterson*, the precedent established by *Mullaney* was only "that a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense." *Id.* at 215. The error in *Mullaney*, said *Patterson*, was that Maine had shifted "the burden of persuasion with respect to a fact which the State deems so important that it must be either proved or presumed." *Id.* Anything additional implied in the *Mullaney* opinion did not survive *Patterson*. As *Patterson* explained:

> It was unnecessary to go further in *Mullaney*. The Maine Supreme Judicial Court made it clear that malice aforethought, which was mentioned in the statutory definition of the crime, was not equivalent to premeditation and that the presumption of malice traditionally arising in intentional homicide cases carried no factual meaning insofar as premeditation was concerned. Even so, a killing became murder in Maine when it resulted from a deliberate, cruel act

committed by one person against another, suddenly without any, or without a considerable provocation. Premeditation was not within the definition of murder; but malice, in the sense of the absence of provocation, was part of the definition of that crime. Yet malice, *i.e.*, lack of provocation, was presumed and could be rebutted by the defendant only by proving by a preponderance of the evidence that he acted with heat of passion upon sudden provocation. In *Mullaney* we held that however traditional this mode of proceeding might have been, it is contrary to the Due Process Clause as construed in [*In re Winship*, 397 U.S. 358, 364 (1970)].

*Id.* at 215–16 (internal quotation marks and citation omitted).

Here, no element of the offense of first-degree murder was presumed. A reasonable jurist could interpret *Patterson* as not requiring an additional instruction that the government must prove the absence of heat of passion beyond a reasonable doubt. *See Bland v. Sirmons*, 459 F.3d 999, 1013 (10th Cir. 2006) ("*Patterson* . . . limited *Mullaney* to situations where a fact is presumed or implied against a defendant."); *United States v. Molina-Uribe*, 853 F.2d 1193, 1204 (5th Cir. 1988) (*Lofton* went "too far in making the prosecution prove the absence of heat of passion even when the element of malice is neither presumed nor required to be disproved by the defendant"), *overruled on other grounds by United States v. Bachynsky*, 934 F.2d 1349 (5th Cir. 1991) (en banc). Also, Defendant has not pointed to language in *Mullaney*, or any other Supreme Court decision, requiring an instruction stating that the jury may consider a manslaughter charge before reaching a verdict on first-degree murder. In sum,

nothing in the OCCA's disposition of the *Lofton* issue was contrary to, or an unreasonable application of, clearly established Supreme Court law.

## VI.   INEFFECTIVE ASSISTANCE OF COUNSEL

To prevail on a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced his defense.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  Counsel's performance was deficient if it "fell below an objective standard of reasonableness," *id.* at 688, which is "the range of competence demanded of attorneys in criminal cases," *id.* at 687 (internal quotation marks omitted).  Our review is "highly deferential" and we "indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted).  To show prejudice at the guilt stage of a trial, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors," *id.* at 694, the jury "would have had a reasonable doubt respecting guilt," *id.* at 695.  At the penalty phase, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Id.*  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

Under § 2254(d) it is not easy to establish that a state court's application of *Strickland* was unreasonable. As the Supreme Court recently noted, "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 131 S. Ct. at 788 (citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

With these standards of review in mind, we turn to Defendant's ineffectiveness claims.

## A.    Manslaughter Argument

Defendant contends that defense counsel's closing argument undermined the principal theory of the defense—that he was guilty only of first-degree manslaughter, not first-degree murder—by conceding the absence of an essential component of manslaughter. For a homicide to be manslaughter, it must be committed in the heat of passion. And that passion must be the result of "adequate provocation," which is "*improper* conduct of the deceased toward the defendant which naturally or reasonably would have the effect of arousing a sudden heat of passion within a reasonable person in the position of the defendant." Instruction No. 10, Trial R., Vol. III at 82 (emphasis added). Defendant's complaint about his attorneys is that they conceded that Mr. Pogue's

conduct was not improper. After careful review, however, we believe that the OCCA's rejection of this complaint was reasonable.

Defense counsel devoted much of their closing argument to heat of passion. They emphasized that the tragic incident happened in the dark; that everything happened very fast; and that everyone had to make split-second decisions (some while intoxicated). They claimed that Defendant had only 30 seconds to decide how to protect his brothers, both of whom were yelling from opposite sides of the road and were apparently in physical danger. And counsel argued that Defendant could not have planned to kill anyone because he carried only a pocket knife with him, leaving far more lethal weapons at his brother's house.

Defense counsel allegedly failed, however, when it came to arguing that the cause of this heat of passion was the victim's misconduct. Indeed, counsel told the jury that Mr. Pogue and Mr. Lewis "weren't doing anything wrong" on the night of the murder, Tr., Vol. III at 747, and that "[n]ot once did we [defense counsel] tell you this was [the victims'] fault," *id.*

The OCCA rejected this ineffectiveness claim. It stated:

[Defense counsel] marshaled the evidence and vehemently argued [that Defendant] never intended to kill anyone and that the evidence supported heat of passion manslaughter. Although counsel did not characterize the victims' conduct as improper so as not to alienate the jury, she argued the conduct had to be taken into consideration as to how [Defendant] perceived it and reacted to it. She mindfully characterized the inconsistencies between [Mr.] Lewis' version of events and that of the defendants as nagging questions the jury must consider.

-34-

*Black*, 21 P.3d at 1071. The OCCA concluded that defense counsel's closing argument represented "a sound strategic decision that [should] not be second-guessed on appeal." *Id.*

We cannot say that the OCCA unreasonably applied *Strickland*. The defense faced a difficult quandary. Although a manslaughter verdict would require the jury to find that Mr. Pogue engaged in "improper conduct . . . toward [Defendant]," Trial R., Vol. III at 82 (Instruction No. 10), it would be dangerous to attack Mr. Pogue directly. He was a sympathetic victim, someone with a good reputation in the community. Defendant and the other assailants bore primary responsibility for the events leading to the fight. Messrs. Pogue and Lewis had no connection to the Blacks and their friends, and, unlike Defendant, had not left home seeking a confrontation. Any effort by counsel to blame the victims would be as likely to backfire as to diminish Defendant's culpability in the jury's eyes. Subtlety was therefore necessary. For example, defense counsel said that he would have thrown the first punch, as Mr. Lewis did, *see* Tr., Vol. III at 747 ("I've got a lot of Rick Lewis in me because I would have done the same thing, and I would have threw [sic] the first punch."), but then said that he (defense counsel) would have been wrong to do so, *see id.* at 753 ("All the things these guys were doing to [the victims] were wrong, were menacing, were words or even threats. Still not adequate to start a fight. And I would be wrong there, too, because I would throw the first punch, but that's what happened."). And defense

-35-

counsel pointed to evidence that the victims had overreacted. *See id.* at 769 ("Why is it that Mr. Lewis and apparently Bill Pogue, why did they get upset that someone was following them too closely on the highway?"), *id.* at 770 ("Why did Mr. Lewis tell Mr. Pogue don't let them pass us? Why not? Who cares?"), *id.* at 771 ("[W]hy did Bill Pogue throw the first punch?"). In essence, defense counsel was trying to suggest that the victims bore some of the blame while ostensibly denying it, knowing that the jury would not be bound by any concession of defense counsel. *See Barkell v. Crouse*, 468 F.3d 684, 692 (10th Cir. 2006) ("Jurors . . . may well be more persuaded of the importance of an [inference] if they think that they have made the discovery on their own rather than on the importuning of an advocate."). Such a strategy has deep roots in the history of rhetoric. *See, e.g.*, William Shakespeare, Julius Caesar act 3, sc. 2 ("I come to bury Caesar, not to praise him."). Perhaps defense counsel were not as persuasive as Marc Antony, but they may have had less to work with.

## B.    Failure to Investigate or Present Evidence

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Defendant asserts that his counsel was deficient in failing to investigate and present evidence (1) that "Mr. Pogue was more physically vital than indicated by the trial evidence," Aplt. Br. at 66, and (2) that Mr. Pogue could have driven around the Neon blocking the path of his Blazer.

-36-

The OCCA rejected these claims. *See Black*, 21 P.3d at 1070–72. We address them in turn.

### 1. Mr. Pogue's Health

Defendant's complaint appears to be that his counsel did not conduct an investigation that would have enabled him to introduce at trial some medical records of Mr. Pogue and evidence that he had participated in rodeo roping events in 1996 (the crime was in January 1998). But it was not unreasonable for the OCCA to hold that Defendant showed neither deficient representation nor prejudice. Given the testimony that Mr. Pogue "was able to hold down and contain Jimmy Black," *id.* at 1071—who was 29 years old, 6'1'' tall, and weighed 205 pounds[8]—there was no real need to conduct an investigation to establish his physical prowess; and the medical records would have been of scant help because they showed that a year and a half before the incident, Mr. Pogue "had asthma and did little because he was clinically depressed," *id.*

### 2. Driving Around the Neon

Mr. Lewis testified that Defendant's Neon repeatedly flashed its lights as it came up behind Mr. Pogue's Blazer at a very high rate of speed, then passed the Blazer and stopped in the highway. He said that the Neon blocked the road, making it impossible for the Blazer to go around on the roadway. He and Charles

---

[8] The OCCA described Jimmy Black as 6'2'' tall, 230 lbs. and 25 years old. *See Black*, 21 P.3d at 1071. The district court noted the discrepancy between the trial transcript and the OCCA's opinion. *See* R., Vol. 1 pt. 3 at 495 n.12.

Pogue also testified that it would have been dangerous to try to avoid the Neon by driving off the road because the embankment was steep and the ground was wet.

Defendant contends that his trial counsel should have conducted further investigation and taken pictures of the scene of the confrontation to show the jury that the victims did not need to stop their Blazer on the road but could have driven around the Neon. The OCCA rejected Defendant's claim. It noted that defense counsel had questioned witnesses about whether the Blazer could have gone around the Neon, and it stated that defense counsel's strategy not to demonize Mr. Pogue included refraining from arguing that "he was the aggressor who purposefully stopped his Blazer to teach [Defendant and his companions] a lesson for honking at him rather than going on by or that Pogue somehow had a duty to go around" the Neon. *Id.* at 1072.

We cannot say that the OCCA was unreasonable in concluding that competent counsel would not necessarily have pursued additional evidence. Not only did defense counsel elicit testimony from Jimmy Black that the Blazer could have driven around the Neon, but she obtained valuable evidence to support that conclusion during the cross-examination of Deputy Sheriff Martin Matney. Deputy Matney testified that the asphalt roadway was 19 feet wide and that the distance from the edge of the roadway to the fence on either side was about 25 feet. Although he added that if the Neon was stopped across the center line, the Blazer would have had to leave the pavement to go around it and that the slope on

the side would cause problems, he still agreed with defense counsel that the Blazer probably could have managed.

Moreover, the issue was peripheral. Defendant strenuously argues that the evidence might have been critical because the issue was disputed and evidence that Mr. Lewis could have driven around the Neon would cast him and Mr. Pogue "as more involved in initiating the combat." Aplt. Br. at 68. But it is not apparent why the jury would care much whether the Neon completely blocked the Blazer's path. The evidence was clear that the occupants of the Neon were seeking a confrontation. And it is not particularly relevant whether Mr. Pogue did all in his power to avoid facing the Neon's occupants. What was important to Defendant's defense was what happened after both vehicles stopped. A competent attorney could have reasonably decided that enough attention had been devoted to the driving-around issue.

Defendant also argues that he should have been granted an evidentiary hearing on his failure-to-investigate claims. We reject the argument because he fails to explain any purpose for such a proceeding. In particular, our resolution of these issues did not require any determination of credibility, and he does not state what additional evidence he would hope to elicit at a hearing.

## VII. EXTRANEOUS EVIDENCE

Defendant's extraneous-evidence claim also concerns whether Mr. Pogue could have driven around the Neon. Defendant claims that his conviction must be

overturned because the jury's deliberations were tainted by a juror's statement of his personal knowledge of the roadway. Requesting an evidentiary hearing on the matter, Defendant submitted to the OCCA an affidavit from a juror stating that "an unnamed juror, who was somehow familiar with the crime scene area, told the other jurors that Pogue could not have gone around the Neon because of a ditch on the side of the road." *Black*, 21 P.3d at 1071 n.24. The OCCA rejected the argument. It said:

> Both Lewis and Charles Pogue testified Pogue could not go around the Neon because of the bar ditches. Nowhere in the affidavit does the juror state that she or the other jurors relied on this unnamed juror's opinion rather than on the evidence. Given that this affidavit does not support a finding that the jury relied on extraneous information, the request for an evidentiary hearing is denied.

*Id.* at 1072. The OCCA's decision was neither an unreasonable application of Supreme Court law nor an unreasonable determination of the facts.

The Supreme Court has declared that a "verdict must be based upon the evidence developed at the trial." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Explaining that principle, it wrote: "In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel." *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965). "Evidence" provided by a fellow juror during deliberations is therefore

-40-

inconsistent with the right to trial by jury. *See Bibbins v. Dalsheim*, 21 F.3d 13, 16–18 (2d Cir. 1994) (per curiam) (considering the prejudicial effect of a juror's statements about the crime scene during deliberations).

But not all extraneous evidence requires setting aside the verdict. As both parties agree, Defendant is entitled to relief only if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Vigil v. Zavaras*, 298 F.3d 935, 940 (10th Cir. 2002) (internal quotation marks omitted). We cannot read the jurors' minds to determine the effect or influence of the improperly communicated information; but we may consider such factors as:

> (1) the degree to which the jury discussed and considered the extrinsic information; (2) the extent to which the jury had difficulty reaching a verdict prior to receiving the improper evidence; (3) the degree to which the information related to a material fact in the case; (4) when the jury received the extrinsic evidence; (5) the strength of the legitimate evidence; and (6) whether the extrinsic evidence merely duplicates evidence properly before the jury.

*Id.* at 941 (citations omitted).

The OCCA focused on factors (1) and (6)—the absence of evidence that the jury considered the information and the fact that the information duplicated trial testimony. But the jury's quick verdict (it reported its verdict before 3:00 p.m. on the same day that it heard the court's instructions and closing argument beginning at 9:00 a.m.) and the peripheral importance of how much Defendant's car blocked the victims' vehicle support the same conclusion.

-41-

Viewing the record as a whole, we believe that the OCCA's rejection of Defendant's claim on the record before it is entitled to AEDPA deference.

## VIII. PROSECUTORIAL MISCONDUCT

Defendant complains of multiple comments made by the prosecutors during guilt- and sentencing-stage closing arguments. To establish a constitutional violation, Defendant must show more than that "the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). And "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974). The issue is whether Defendant was denied his due-process right to a fair trial—that is "whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation marks omitted). Making this determination requires viewing the challenged remarks in context. *See id.* at 179. In *Darden* the Court considered the trial court's instructions, the weight of the evidence, whether the comments were in response to defense counsel's arguments, whether the comments misstated the evidence or implicated a specific constitutional right, and whether defense counsel had an adequate opportunity to rebut the comments. *See id.* at 181–82. On habeas review our task is to

determine whether the OCCA's resolution of the issue was either contrary to, or an unreasonable application of, the *Darden* standard, or was based on an unreasonable determination of the facts.

The first challenged statement was during the prosecution's guilt-stage closing argument: "Starting this case I don't know Bill Pogue. You folks don't know Bill Pogue. That's why you're here. And through the last few weeks talking to the family, talking to Rick, talking to Charles, talking to Lanetta his wife, I've gotten to know Bill Pogue." Tr., Vol. III at 796. Defense counsel objected, and the court admonished the prosecutor, "Let's not go into matters that are outside the record." *Id.* The prosecutor continued, "You have gotten to know Bill Pogue through these statements of what happened, through those witnesses. You know he was a good person." *Id.*

The OCCA reasonably ruled that the statement did not render Defendant's trial unfair. Before the opening statements the court had instructed the jury that the arguments and statements of counsel are not evidence. And when the prosecutor made the challenged statement, the court chastised him for apparently referring to matters not in evidence, and the prosecutor responded by referring to the evidence about the victim. *See Duvall v. Reynolds*, 139 F.3d 768, 794 (10th Cir. 1998) (prosecutor's comment did not deprive defendant of due process, in part because "the defense attorney contemporaneously objected to the prosecutor's comment" and "[t]he trial court . . . sustained the objection and

admonished the prosecutor for the comment in the presence of the jury"). To the extent that Defendant contends that the prosecutor's reference to Mr. Pogue as a "good person" was a play for sympathy, *see id.* at 795 ("We do not condone comments encouraging the jury to allow sympathy, sentiment, or prejudice to influence its decision."), we fail to see how this was prejudicial when defense counsel had already said in his argument that "[t]here is no doubt that Mr. Pogue was a good man," Tr., Vol. III at 746. Moreover, the trial court instructed the jury not to allow sympathy or sentiment to enter its deliberations, and we presume that juries obey instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them.").

> Later the prosecutor said:
>
> [Charles (Mr. Pogue's son)] drives him to the hospital, has to roll down the window because he can't get oxygen. What's one thing Bill Pogue said? Take care of Rick. Take care of Rick. Bill Pogue knew at that moment he wasn't gonna make it. He knew. And when they get to the hospital, Charles has to hold his dad down on the table while his dad struggles to get breath. Then he looks at Charles. Without saying a word, he says good-bye.

Tr., Vol. III at 797. Although defense counsel did not object to this statement at trial, Defendant now argues that it too was an impermissible play for victim sympathy. The statement, however, was a summary of trial testimony. Because

-44-

the evidence itself was so likely to evoke sympathy, it was probable that the jury sympathized with the victim "long before the prosecutor gave his closing remarks." *Duvall*, 139 F.3d at 795.

Next, Defendant challenges the following statement during the guilt-stage closing argument by prosecutor Bret Burns, which followed the argument by defense counsel Deborah Maddox:

> We are prosecutors because we believe in what we do because we have a chance to come in front of you and speak for those who cannot speak. That's why we're here. I mean that's—our heart is in this deal. For [defense counsel] to attack Mr. Christian on his righteousness, M[s.] Maddox to say that—what was her exact word? He filed this for political "ummph". Filed it First Degree Murder for political "ummph". Filed it First Degree Murder because it is First Degree Murder. Ms. Maddox does not like basically the D.A.'s theories. She attacked Mr. Christian's Christianity at one point. Didn't believe he was a Christian for filing this Bill of Particular death penalty. You know we are here for a job. I—I don't—I'm gonna tell you right now Mr. Christian is a Christian.

Tr., Vol. III at 791. We fail to see error in the comments before the references to Christianity. In her closing argument Ms. Maddox had impugned the prosecutors' motives, saying:

> [B]ack when laws were law and they were written by men and we all understood that, prosecutors would charge Manslaughter. Why? Because that's what happened. Johnny Black has offered this Jury a plea of guilty to manslaughter, and Mr. Christian has the nerve to stand up here and say that's not good enough. I want something with more political "umppp" to it. I want something that'll bring me a death penalty case, get lots of coverage. Manslaughter cases are not big news.

*Id.* at 757–58.  The first part of the prosecutor's statement was not an unreasonable response to this personal attack, *see United States v. Young*, 470 U.S. 1, 12–13 (1985) ("[I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."), although it would have been preferable for the trial judge to intervene or the prosecutors to have objected to defense counsel's argument as irrelevant, *see id.* at 13 ("[T]he prosecutor . . . should have objected to the defense counsel's improper statements" but "interruptions of arguments . . . are matters to be approached cautiously.").

The reference to Mr. Christian's religious faith, however, was wholly improper, particularly because, contrary to Mr. Burns's assertion, defense counsel had not attacked that faith.  Nevertheless, the OCCA could reasonably determine that the statement did not deny Defendant a fair trial.  To begin with, defense counsel objected as soon as Mr. Burns said "Mr. Christian is a Christian," and the trial judge promptly responded, "That's not relevant."  Tr., Vol. III at 791. Further, we note that in some cultures being a generic "Christian" is not particularly noteworthy, but generally assumed.  It would have little impact unless the person was said to be especially devout or the religious description was intended to strike a contrast with someone (say the defendant or defense counsel) who was not of that faith.  The OCCA could take that into consideration.

The remaining statements challenged by Defendant were made during the penalty-stage closing arguments. Defendant argues that two statements by the prosecutor improperly limited what the jury could consider in assessing punishment and diminished its sense of responsibility in returning a death-sentence recommendation. The first statement was endorsed by the trial court. The trial transcript reports the following:

> [Prosecutor]: And Defense Counsel also said judging Johnny Black's life. Ladies and Gentlemen, we're not judging his life. We're judging the actions that caused the death of Bill Pogue, Cecil Martin and Rick Lewis.
>
> [Defense counsel]: Objection, Your Honor, we are not just judging those things. Mitigating circumstances exist.
>
> THE COURT: I think that the statement is proper. I will allow the statement and note your exception. Go ahead.
>
> [Prosecutor]: Thank you. We're judging these facts here. We're judging what this man has done.

*Id.*, Vol. IV at 999–1000. Shortly thereafter, the prosecutor made the second statement: "She [defense counsel] wants to compare murders. We don't compare murders say this murder deserves death, this one doesn't. That's not the way our system works." *Id.* at 1000. Defense counsel did not object.

Defendant argues that these statements misinformed the jury that it should not consider mitigating evidence or make an individualized decision regarding the death penalty. The record shows otherwise.

-47-

The prosecutor's first statement must be viewed in context.  In her closing

argument defense counsel had invoked God on two occasions.  Referring to the

burden of making a life-or-death decision, she said:

> That's why I and a lot of the people in this world are comfortable
> with the fact that someone higher above us makes that decision,
> carries the weight and the fate and destiny of those sixty or seventy
> [members of Defendant's family].

Tr., Vol. IV at 979.  And in discussing whether Defendant could find God in

prison, she said:

> God lives on death row.  That's where his clientele lives.  That's
> where he goes to save people, and let me tell you people are saved.
> Doesn't ever mean they should ever walk the streets of Oklahoma
> again.  No.  But is this value in changing the sole [sic] of a human
> being from someone that is bad and make someone that is good,
> repentant.  God, I hope so.  I really, really hope so.

*Id.* at 981.  The prosecutor was responding to these invocations of the divine

when he made the initial challenged statement.  We repeat (and emphasize) that

statement but add the preceding few sentences:

> [Prosecutor]:  Defense Counsel briefly, in her opening statement, she
> made a few comments.  She talked about—again about beliefs in God
> and greater power, and we've already talked about that.  There'll be a
> judgment day for Johnny Black.  He can seek forgiveness from his
> maker however he chooses fit.  God may decide to forgive him.
> That's between he and God.  We're not in a position of judgment on
> Mr. Black's moral character here or whether he's gonna go to
> heaven.  That's not what we're here about.  *And Defense Counsel*
> *also said judging Johnny Black's life.  Ladies and Gentlemen, we're*
> *not judging his life.  We're judging the actions that caused the death*
> *of Bill Pogue, Cecil Martin and Rick Lewis.*

[Defense counsel]: Objection, Your Honor, we are not just judging those things. Mitigating circumstances exist.

THE COURT: I think that the statement is proper. I will allow the statement and not your exception. Go ahead.

[Prosecutor]: Thank you. We're judging these facts here. We're judging what this man has done.

*Id.* at 999–1000 (emphasis added). In this light, it appears that the prosecutor was simply saying that the jurors are not God, are not judging Defendant's soul, but are just making a decision on the evidence before them. And insofar as the statement could be read as suggesting that the jury should not consider mitigating factors, that impression would be dispelled by the prosecutor's later discussion of mitigating factors and, more importantly, by the judge's unchallenged instructions, which informed the jury of the meaning of mitigating circumstances, enumerated the mitigating circumstances on which Defendant had submitted evidence, said that the jury could decide that other mitigating circumstances existed, told the jury that unless it unanimously found that aggravating circumstances outweighed mitigating circumstances, it could not impose the death penalty, and gave the jury discretion to impose life imprisonment even if it found that aggravating circumstances outweighed mitigating circumstances. We presume that the jury followed these instructions. *See Francis*, 417 U.S. at 324 n.9. Accordingly, we hold that the prosecutor's first comment did not violate Defendant's right to due process. *See Le v. Mullin*, 311 F.3d 1002, 1018 (10th

Cir. 2002) (Despite prosecutor's "improper and irrelevant" comments, which may have implied that jury could ignore mitigating evidence, "a review of the record indicated that the jury was appropriately informed by the jury instructions and by closing arguments that it had to consider mitigating evidence before deciding to impose a death sentence."). Thus, it is unnecessary for us to address Defendant's argument that the OCCA did not consider this comment and that we therefore owe no AEDPA deference on the issue.[9]

Turning to the prosecutor's second comment—"She wants to compare murders. We don't compare murders say this murder deserves death, this one doesn't," Tr., Vol. IV at 1000—the remark was a response to defense counsel's argument that Defendant was not of the same ilk as Ted Bundy and the like. His comment would have been proper had it been limited to saying that the death penalty is not reserved for such people. But he went too far in suggesting that all murders are the same. Nevertheless, we do not think that the OCCA unreasonably applied Supreme Court precedent or unreasonably viewed the record in rejecting Defendant's challenge. Everything else about the closing arguments and the court's instructions told the jury that murders are not fungible, that the jury

---

[9] The OCCA divided the challenged prosecutor comments into two groups: (1) those objected to by defense counsel that were cured when the trial court instructed the jury to disregard the comments and (2) those remarks to which defense counsel did not object. *See Black*, 21 P.3d at 1078. Defendant argues that the OCCA did not address the "we're not judging his life" comment because it was in neither of the two groups: defense counsel objected to the comment, but the trial court overruled the objection.

should consider the specifics of this crime and this particular criminal. Indeed, if the specifics of the offense and the offender were irrelevant, there would have been no need for a sentencing proceeding.

Defendant next contends that the first of the prosecutor's comments quoted above—that the jury was not judging Defendant's life—violated an Eighth Amendment requirement set forth in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). *Caldwell* considered a prosecutor's penalty-phase argument, endorsed by the trial judge, that the jurors would not be responsible for killing the defendant because their decision would be automatically reviewable by the state supreme court. *Id.* at 325–26. The Supreme Court held "that it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328–29. But *Caldwell* should not be read too broadly. In a later opinion upholding the admission of sentencing-phase evidence that the defendant had been sentenced to death in a prior trial, the Court said that *Caldwell* is "relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994) (internal quotation marks omitted). That is not the situation here. The prosecutor's remark did not suggest that the jury lacked responsibility for deciding what the penalty

would be; and Defendant does not challenge any statement or instruction by the trial court that explained the jury's role.

Defendant further challenges the penalty-phase closing argument because of the prosecutor's comment on Defendant's statement to a police officer when he was apprehended after escaping from the jail where he was being held on the murder charge. He was discovered hiding in a closet in a private home. Upon finding Defendant, the officer asked him who he was, and he responded, "I am who I am." *Id.*, Vol. III at 876. In arguing Defendant's lack of remorse, the prosecutor commented as follows: "I am who I am. That's what [Defendant] told [the officer]. I am who I am. Who does he think he is? Charles Manson? I am who I am. Does he think he's a celebrity now? He's this big runaway escapee?" *Id.*, Vol. IV at 1000–01. Defendant did not object at trial. And for good reason. Although the prosecutor may have been inspired by defense counsel's earlier comments that Defendant was not like multiple killers Ted Bundy, Jeffrey Dahmer, or Roger Dale Stafford, the prosecutor was not suggesting that Defendant was a serial killer. Rather, he apparently was suggesting that Defendant had a god-like (or at least inflated) view of himself. *See Exodus* 3:14 (New International Version) ("God said to Moses, 'I AM WHO I AM.'"). We fail to see how the OCCA was unreasonable in holding that the suggestion did not deny Defendant a fair trial.

Defendant also challenges the prosecutor's comparison of Bill Pogue's fate with Defendant's life in prison. The prosecutor said:

> [Defense counsel] makes the comments family will be able to visit [Defendant]. Fine. Through a plexiglass window, I won't be able to touch. Fine. He'll have T.V.s, weight bench. Fine. Where is Bill Pogue's T.V.s? Where's his weight benches? Where is his family contact? Bill Pogue won't get to develop relationships with his family. The only contact they have is going to be out here at the . . . cemetery. He won't develop a relationship with the eighteen day old baby that was his grandchild that was there. You know, and you heard he had a hunting and fishing wagon. I went hunting Sunday. The sun was setting and my bird dogs were pointing, and I'm thinking of Bill Pogue. He won't be able to spend time with his family doing things he wants. So all this whining saying oh, this is what's gonna happen, I'm gonna have family there, this and that, it's not this pleasant life. Where is Bill Pogue?

Tr., Vol. IV at 1004–05. Defense counsel objected on the ground of "constant derogation of the family and their mitigation evidence that they presented." *Id.* at 1005. The court instructed the jury to "remember the testimony that's been given." *Id.*

"As we have said many times, it is prosecutorial misconduct for the prosecution to compare the plight of the victim with the life of the defendant in prison." *Bland*, 459 F.3d at 1028. But reversal of the sentence is a proper remedy for such misconduct only if the misconduct denied Defendant a fair sentencing proceeding. And our role is further limited because we review only whether the OCCA's decision to deny relief was contrary to or an unreasonable application of Supreme Court precedent. In our view, the OCCA decision must

be sustained under that standard. The trial court's admonition to the jury, although poorly stated, at least suggested that the prosecutor's comments were improper. The question whether prison life was easy or "a miserable existence" had already been put before the jury by defense counsel. Tr., Vol. IV at 982. And, as the OCCA observed, there was substantial evidence supporting the statutory aggravators for the death penalty.[10]

In addition to challenging the preceding remarks individually, Defendant argues that the prosecutorial "misconduct as a whole denied [him] a fair trial at both stages." Aplt. Br. at 90. Although the prosecutors did make some improper comments during their arguments, our review of the record reveals that those

---

[10] The jury found the following aggravating circumstances: (1) "The murder was especially heinous, atrocious, or cruel"; (2) "During the commission of the murder, the Defendant knowingly created a great risk of death to more than one person"; (3) "The Defendant, prior to the murder, was convicted of a felony involving the use or threat of violence to the person"; and (4) "At the present time there exists a probability that the Defendant will commit criminal acts of violence that would constitute a continuing threat to society." Trial R., Vol. III at 105; *see Black*, 21 P.3d at 1078. The evidence showed (1) that Mr. Pogue "was conscious and alive suffering pain during and after the attack," *id.* at 1074; *see Le v. State*, 947 P.2d 535, 550 (Okla. Crim. App. 1997) ("[H]einous, atrocious, or cruel . . . aggravating circumstance requires proof of conscious serious physical abuse or torture prior to death; evidence a victim was conscious and aware of the attack supports a finding of torture."); (2) that Defendant "stabbed [Mr.] Lewis thirteen times including wounds to the back of the head and one to the chest," *Black*, 21 P.3d at 1073; (3) that Defendant had previously been convicted of manslaughter for shooting another man; and (4) that Defendant had escaped from jail while awaiting trial, had threatened to kill Shankles for getting him in trouble, and had left a threatening note for his jailer when he escaped.

comments, even when considered cumulatively, did not render Defendant's guilt-

or penalty-stage proceedings unfair.  We therefore deny this claim.[11]

## IX.    CUMULATIVE ERROR

"A cumulative-error analysis aggregates all errors found to be harmless and

analyzes whether their cumulative effect on the outcome of the trial is such that

collectively they can no longer be determined to be harmless."  *Brown v. Sirmons*,

515 F.3d 1072, 1097 (10th Cir. 2008) (internal quotation marks omitted).

Defendant argues that if the constitutional violations alleged in his application do

---

[11] On several occasions Defendant's briefs in this court assert that we must give "heightened scrutiny" to a prosecutor's closing argument in the penalty phase of a capital trial.  *See, e.g.*, Aplt. Br. at 82.  Nowhere, however, does he try to explain what that extra scrutiny entails.  In particular, he does not argue that the OCCA applied an incorrect standard of review to any of the prosecutor's statements (except, perhaps, with respect to the alleged *Caldwell* violations, which we rejected without deferring to the OCCA's decision).  We recognize that he cites our opinion in *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002), but only to support his assertion of the need for "heightened scrutiny."  Aplt. Br. at 82.  He does not argue that the OCCA should have reviewed any misstatements by the prosecutor under the standard stated in *Duckett*:  "'whether the comments might have affected the sentencing decision.'"  306 F.3d at 992 (quoting *Coleman v. Brown*, 802 F.2d 1227, 1228 (10th Cir. 1986)).  In any event, this dictum in *Duckett* (which affirmed the denial of habeas relief) does not express the law in this circuit, much less clearly established Supreme Court law.  The standard set forth in *Coleman* was based on that panel's interpretation of *Caldwell*; but a later en banc decision of this court rejected that standard, holding that our test for evaluating *Caldwell* violations is "whether there is a substantial possibility that the prosecutor's statements, taken in context, affected the sentencing decision." *Hopkinson v. Shillinger*, 888 F.2d 1286, 1295 (10th Cir. 1989) (en banc), *overruled on other grounds by Sawyer v. Smith*, 497 U.S. 227 (1990).  As for non-*Caldwell* errors during penalty-phase arguments, we apply the same fundamental-fairness standard applied by the OCCA.  *See Fox v. Ward*, 200 F.3d 1286, 1299–1300 (10th Cir. 2000).

not require relief individually, then they should be aggregated and considered for their synergistic effect. The OCCA rejected Defendant's cumulative-error argument on the merits. *See Black*, 21 P.3d at 1078. According to the OCCA, its thorough review of the record "reveal[ed] no error which, singly or in combination, would justify either modification or reversal. Any irregularities or errors were harmless beyond a reasonable doubt." *Id.*

Defendant relies on *Cargle v. Mullin*, 317 F.3d 1196, 1221 (10th Cir. 2003), in which we granted habeas relief because of cumulative error, and attempts to analogize the facts of that case to his own. But his reliance on *Cargle* is unavailing. First, in *Cargle* we reviewed the applicant's cumulative error claim de novo, without deference to the state court's decision, because the OCCA had not "conduct[ed] the appropriate cumulative error review." *Id.* at 1220. In this case, however, we have not found additional errors beyond those identified by the OCCA. Therefore, our standard of review is that set forth in § 2254(d). Second, the facts leading us to find cumulative error in *Cargle* are wholly distinguishable from the facts present here. In *Cargle* essentially all the alleged constitutional errors related to the State's two critical witnesses. *See id.* at 1221. The court's observation that the prosecution's case was weak and "totally dependent on the credibility of these two witnesses" led it to conclude "that habeas relief [was] warranted on the basis of cumulative error." *Id.* We are not persuaded that the constitutional violations alleged in Defendant's application had an "inherent

-56-

synergistic effect." *Id.* For these reasons, we hold that the OCCA did not unreasonably apply federal law in denying this claim.

## X.    PROCEDURAL BAR

We now turn to Defendant's claims that were dismissed by the district court as procedurally barred. These claims were not presented to the OCCA on Defendant's direct appeal or his first postconviction application in state court. When presented in his second state postconviction application, the OCCA denied the application under Okla. Stat. tit. 22, § 1089(D)(8), which precludes the court from considering a second postconviction application unless it "contains claims and issues that have not been and could not have been presented . . . in a previously considered application . . . because the legal basis for the claim was unavailable, or . . . because the factual basis for the claim was unavailable." *See* Op. Denying Second Appl. for Post-Conviction Relief & Req. for an Evidentiary Hr'g at 3, *Black v. State*, No. PCD-2006-1059 (Okla. Crim. App. Apr. 14, 2008) (unpublished) ("Decision on Second Postconviction Appeal at 3"). The OCCA ruled that the claims at issue here "were capable of presentation in [Defendant's] direct appeal and original application for post-conviction relief" because they were "based neither on newly-discovered facts nor on new controlling legal authority." *Id.* The federal district court refused to address the merits of these claims in Defendant's § 2254 application.

In this court the State relies on procedural bar and does not address the merits of the issues. Ordinarily, "absent showings of 'cause' and 'prejudice,' federal habeas relief will be unavailable when (1) a state court has declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011) (brackets, citation and internal quotation marks omitted). Defendant argues three grounds why the procedural bar does not apply: (1) he is actually innocent of first-degree murder and the death penalty, (2) the state procedural bar is not adequate, and (3) the bar is not independent of federal law. We address each argument in turn.

### A.      Factual Innocence

The Supreme Court has "consistently reaffirmed the existence and importance of the exception [to the general rules of procedural default] for fundamental miscarriages of justice." *Schlup v. Delo*, 513 U.S. 298, 321 (1995). This exception applies to those who are actually innocent of the crime of conviction and those "actually innocent" of the death penalty (that is, not eligible for the death penalty under applicable law). *See Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Sawyer v. Whitley*, 505 U.S. 333, 335–36 (1992) (death penalty).

To establish actual innocence of a crime, one "must show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a

reasonable doubt" absent a constitutional error. *Schlup*, 513 U.S. at 327.

Defendant argues that he is actually innocent of first-degree murder because he

could have been convicted of the lesser offense of manslaughter. But we held in

*Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000), that to demonstrate a

fundamental miscarriage of justice, a defendant must make a showing of factual

innocence, not legal innocence, and the defendant in that case had not raised a

claim of factual innocence because he did not deny that he had killed the victim.

Later, in *Ellis v. Hargett*, 302 F.3d 1182, 1186 n.1 (10th Cir. 2002), we held that

a defendant's claim that he was "innocent because his conduct [was] justified or

mitigated by the doctrines of self-defense or heat of passion" was a claim of

legal—as opposed to factual—innocence. Defendant concedes that this precedent

forecloses his actual-innocence argument.

As for Defendant's claim that he is innocent of the death penalty, to prevail

he "must show by clear and convincing evidence that, but for a constitutional

error, no reasonable juror would have found [him] eligible for the death penalty

under applicable state law." *Sawyer*, 505 U.S. at 336. Defendant's actual-

innocence claim is based on the trial court's refusal to allow his brother Jimmy to

testify at his sentencing hearing. According to Defendant, Jimmy was going to

testify about Defendant's horrible childhood, and how Defendant had always

looked out for Jimmy and was a father figure to him. Even though Defendant

concedes that Jimmy's testimony was mitigating evidence, he argues that it was

-59-

relevant to his eligibility for the death penalty. He claims that under Oklahoma law, he did not become eligible for the death penalty until the jury (1) found the existence of an aggravating circumstance and (2) determined that aggravation outweighed mitigation. He contends that if the jury had heard Jimmy's testimony, then it would not have found that aggravating circumstances outweighed mitigating factors and thus would not have sentenced him to death.

This argument is foreclosed by *Sawyer*. That opinion emphasized that the actual-innocence exception "is a very narrow exception, and that to make it workable it must be subject to determination by relatively objective standards." *Id.* at 341. To qualify, a defendant must show the absence of aggravating circumstances or some other condition of eligibility. *See id.* at 344–45. The Court rejected the view that "the showing should extend beyond these elements of the capital sentence to the existence of additional mitigating evidence." *Id.* at 345. As the Court explained, broadening the actual-innocence inquiry beyond guilt of the crime and the presence of aggravating circumstances would impose the "far more difficult task [of] assess[ing] how jurors would have reacted to additional showings of mitigating factors, particularly considering the breadth of those factors that a jury under our decisions must be allowed to consider." *Id.* at 346. Thus, even if state law considers the outweighing of mitigating circumstances by aggravating circumstances as an "element" of a capital sentence, it is not an element for purposes of the actual-innocence inquiry.

Because Jimmy Black's testimony went only to mitigation, its persuasiveness is irrelevant to Defendant's "eligib[ility] for the death penalty" and cannot support the actual-innocence exception to procedural bar.

## B.    Adequacy

Defendant next argues that his claim is not procedurally barred because the OCCA's decision in his second postconviction proceeding did not rest on an adequate state ground. But his argument cannot prevail in light of the Supreme Court's exposition of the meaning of *adequate* in its recent decision in *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011).

*Walker* reviewed the Ninth Circuit's ruling that California's time limitation on applications for postconviction relief was inadequate to bar relief in federal court. *See id.* at 1124. In contrast to most state courts, which apply "set determinate time limits for collateral relief applications," California "courts apply a general reasonableness standard to judge whether a habeas petition is timely filed." *Id.* at 1125 (brackets and internal quotation marks omitted). Under California Supreme Court precedent, prisoners must file applications "'as promptly as the circumstances allow,'" *id.* (quoting *In re Clark*, 855 P.2d 729, 738 n.5 (Cal. 1993)), which means that "[a] prisoner must seek habeas relief without 'substantial delay,' as 'measured from the time the petitioner or counsel knew, or reasonably should have known, of the information offered in support of the claim and the legal basis for the claim,'" *id.* (citations omitted) (quoting *In re*

*Robbins*, 959 P.2d 311, 317, 322 (Cal. 1998)).  The defendant in *Walker* had presented his ineffective-assistance-of-counsel claims in a postconviction petition almost five years after his conviction had become final.  *See id.* at 1124.  He gave no reason for the delay, and the California Supreme Court denied his petition. *See id.*

The Supreme Court began with the premise that "[t]o qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'"  *Id.* at 1127.  But, it said,  "[a] rule can be 'firmly established' and 'regularly followed' . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others."  *Id.* at 1128 (internal quotation marks omitted).  Such was California's rule.  *See id.* at 1128–29.  The Court said the rule was firmly established because state precedents "instruct habeas petitioners to allege with specificity the absence of substantial delay, good cause for delay, or eligibility for one of four exceptions to the time bar" and "California's case law made it altogether plain that [the defendant's] delay of nearly five years ranked as 'substantial.'"  *Id.* at 1128 (brackets and internal quotation marks omitted).  The Court rejected the argument that "'reasonable time' period and 'substantial delay' . . . are 'meaningless terms,'" pointing out that discretionary rules often use indeterminate language and the requisite clarity can be supplied by a history of their application.  *Id.* (brackets and hyphen omitted).

The Court further held that the state rule was "regularly followed." It said that "[a] discretionary rule ought not be disregarded automatically upon a showing of seeming inconsistencies." *Id.* at 1130. According to the Court, "Discretion enables a court to home in on case-specific considerations and to avoid the harsh results that sometimes attend consistent application of an unyielding rule." *Id.* "Sound procedure," it said, "often requires discretion to exact or excuse compliance with strict rules, and we have no cause to discourage standards allowing courts to exercise such discretion." *Id.* (brackets, citation, and internal quotation marks omitted). The Court observed that "if forced to choose between mandatory rules certain to be found 'adequate,' or more supple prescriptions that federal courts may disregard as 'inadequate,' 'many States might opt for mandatory rules to avoid the high costs that come with plenary federal review.'" *Id.* (brackets omitted). "That result," it declared, "would be particularly unfortunate for habeas petitioners, who would lose the opportunity to argue that a procedural default should be excused through the exercise of judicial discretion." *Id.* (brackets and internal quotation marks omitted). As we understand *Walker*, the Court ordinarily would find a state discretionary bar to be inadequate only "when discretion has been exercised to impose novel and unforeseeable requirements without fair or substantial support in prior state law," or when "state procedural requirements . . . operate to discriminate against claims of federal rights." *Id.*

Defendant's second state postconviction application was denied because a state statute bars a successive application unless it "contains claims and issues that have not been and could not have been presented . . . in a previously considered application . . . because the legal basis for the claim was unavailable, or . . . because the factual basis for the claim was unavailable," Okla. Stat. tit. 22, § 1089(D)(8), and Defendant's claims did not satisfy the exception.  *See* Decision on Second Postconviction Appeal at 3.  Defendant's inadequacy argument is that the rule is not regularly followed because the OCCA will waive the rule "when an error complained of has resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right."  *Valdez v. State*, 46 P.3d 703, 710 (Okla. Crim. App. 2002).

Defendant's opening brief cites four OCCA decisions that considered the merits of a successive postconviction application even though the claims presented could have been raised previously:  *Malicoat v. State*, 137 P.3d 1234 (Okla. Crim. App. 2006); *Torres v. State*, 120 P.3d 1184 (Okla. Crim. App. 2005); *Slaughter v. State*, 108 P.3d 1052 (Okla. Crim. App. 2005); and *Valdez*, 46 P.3d at 710.  But rather than establishing the inadequacy of Oklahoma's procedural bar, the four cases illustrate the exercise of discretion that *Walker* endorses.  Two of the cited cases, *Torres* and *Valdez*, had international implications because of alleged violation of the Vienna Convention on Consular Relations.  *Malicoat* was the OCCA's first opinion to address the constitutionality of Oklahoma's execution

protocol.  And *Slaughter* raised a claim of factual innocence.  Each of the four cases presented an exceptional circumstance.  Although another court may have exercised its discretion differently than the OCCA, these decisions were hardly arbitrary, and the application of the procedural bar to Defendant's second postconviction petition was neither novel nor unforeseeable.  We hold that the procedural dismissal of Defendant's second postconviction petition rested on an adequate state ground.

## C.    Independence

Finally, Defendant contends that his claims should not be procedurally barred because the state rule under which the OCCA dismissed his second postconviction petition is not independent of federal law.  This contention may be meritorious.

"A state procedural default is 'independent' if it relies on state law, rather than federal law."  *Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008). "[T]he state law ground must have been the exclusive basis for the state court's holding."  *Moore v. Reynolds*, 153 F.3d 1086, 1096 (10th Cir. 1998) (internal quotation marks omitted).

The leading Supreme Court precedent arose in the Oklahoma courts.  In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the OCCA had held that Ake had waived his claims that he was entitled to a court-appointed psychiatrist to assist him in an insanity defense because he had not renewed his request for a psychiatrist in a

new-trial motion. But under Oklahoma law there was no procedural bar if the alleged error was "fundamental trial error"; and federal constitutional error was considered an error of that type. *Id.* at 74–75. Thus, the OCCA could not apply the waiver rule without first addressing the federal constitutional error. The Supreme Court concluded that the state waiver rule was therefore not an independent state ground for barring review. It explained:

> [T]he State has made application of the procedural bar depend on an antecedent ruling on federal law, that is, on the determination of whether federal constitutional error has been committed. Before applying the waiver doctrine to a constitutional question, the state court must rule, either explicitly or implicitly, on the merits of the constitutional question.

*Id.* at 75. "As we have indicated in the past," said the Court, "when resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and our jurisdiction is not precluded." *Id.* The Court concluded that "[i]n this case, the . . . holding of the state court—that the constitutional challenge presented here was waived—depends on the court's federal-law ruling and consequently does not present an independent state ground for the decision rendered." *Id.*

Defendant does not challenge the OCCA's determination that his procedurally barred claims "were capable of presentation in [Defendant's] direct appeal and original application for post-conviction relief," Decision on Second Postconviction Appeal at 3—a determination that obviously did not rely on any

consideration of federal law. He points out, however, that the OCCA has said

that it can review a claim that would otherwise be procedurally barred if the

"error complained of has resulted in a miscarriage of justice, or constitutes a

substantial violation of a constitutional or statutory right." *Valdez*, 46 P.3d at

710; *see Malicoat*, 137 P.3d at 1235. Thus, he argues, to deny him relief on

procedural grounds, the OCCA must have decided that his claims did not raise "a

substantial violation of a [federal] constitutional . . . right," and that decision was

necessarily *not* independent of federal law. Aplt. Br. at 37 (internal quotation

marks omitted). He acknowledges that the OCCA did not explicitly address

federal law. All it wrote in barring his claims was:

> [Defendant] makes no attempt to show that his claims are presented
> timely and meet the requirement that the factual or legal basis for the
> claim was unavailable before now. Instead, he argues that the
> interests of justice necessitate review of his claims by this Court.
> We disagree. All but two of [Defendant's] claims were capable of
> presentation in his direct appeal and original application for post-
> conviction relief. These claims are based neither on newly-
> discovered facts nor on new controlling legal authority, and are
> therefore barred.

Decision on Second Postconviction Appeal at 3. But he correctly points out that

*Ake* requires only that "the state court . . . rule, either explicitly or *implicitly*, on

the merits of the constitutional question." *Ake*, 470 U.S. at 75 (emphasis added).

The state raises a number of nonfrivolous responses to Defendant's

argument. The only one we can reject outright is that *Ake* does not apply in

habeas proceedings. Although the Supreme Court has not had to decide whether

-67-

*Ake*'s independence test applies on collateral review, this court has repeatedly followed the *Ake* test in § 2254 proceedings, and we do so again here. *See Brecheen v. Reynolds*, 41 F.3d 1343, 1354 (10th Cir. 1994) (holding that a state procedural ruling was not independent under *Ake*); *Gutierrez v. Moriarty*, 922 F.2d 1464, 1469 (10th Cir. 1991) ("A state procedural default ruling is not independent if application of the bar depends on an antecedent ruling on the merits of the federal claim." (citing *Ake*, 470 U.S. at 74–75)).

The state's other responses argue that the OCCA did not, and did not need to, consider the merits of Defendant's constitutional claims in deciding that these claims were barred. That may be true. But in light of the importance of the issue to this and other cases, we prefer not to speculate. Therefore, in a separate document we request the OCCA to resolve this question through a certification procedure. Although Defendant cites our en banc decision in *Wilson v. Workman*, 577 F.3d 1284, 1299 (10th Cir. 2009) (en banc), as prohibiting such certification, we do not read *Wilson* that broadly. And we note that the Supreme Court has itself certified a similar question in a death-penalty § 2254 proceeding. *See Stewart v. Smith*, 536 U.S. 856 (2002) (per curiam).[12]

_____

[12]We recognize that dictum in *Gardner v. Galetka*, 568 F.3d 862, 884 (10th Cir. 2009), could be read to say that *Ake*'s independence analysis does not apply to a state's "exceptions" to a procedural bar. But *Gardner* cited no authority for its statement, and it is not clear why an "exception" to a procedural bar, *id.*, should be treated differently than an "antecedent" to a procedural bar, *Ake*, 470 U.S. at 75, for purposes of determining whether the bar is independent of federal

(continued...)

## XI.  CONCLUSION

We AFFIRM the district court's denial of the claims that it did not dispose of on the ground of procedural bar and ABATE the appeal pending consideration by the OCCA of our certification request.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge

---

[12](...continued)
law.  The essential inquiry is whether the state court must resolve the merits of a federal-law claim before holding that the claim is procedurally barred.  And a decision by the OCCA on the certified issue would resolve the independence question.